United States District Court
Southern District of Texas
**ENTERED**
April 28, 2016
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| CURBY HARKLESS, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 3:14-CV-329 |
| | § | |
| BRAZORIA COUNTY, TEXAS, *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

Plaintiff, Curby Harkless, filed this suit against Brazoria County, Texas ("the County"), alleging that County jailers and employees violated his civil rights while he was in the Brazoria County Jail. Harkless originally sued the County, the Brazoria County Sheriff's Office, and the Brazoria County Jail. The County is the sole remaining defendant in this case. The County has filed a motion to dismiss (Dkt. 51). After considering the motion and the relevant briefing, the Court **GRANTS** the County's motion to dismiss, with prejudice.

## BACKGROUND

The following is a brief summary of the allegations made in the Second Amended Complaint. (Dkt. 27). Harkless alleges that he is a wheelchair-bound paraplegic, that he "does not have the use of his legs," and that he requires a catheter to urinate. Harkless was a passenger in a vehicle that was stopped by law enforcement, and it was discovered

that he had two outstanding traffic warrants and was on deferred adjudication.[1] A Brazoria County officer transported Harkless to the Brazoria County Jail, and his bail was posted. Nonetheless, Harkless alleges that he was booked into the Brazoria County Jail and placed into a cell, sitting in his wheelchair, where he waited for "a considerable period of time." Harkless alleges that the County and its employees "failed to conduct a health assessment and failed to complete a medical assessment form," despite his obvious physical impairment. Eventually, Harkless alleges that he needed to empty his bladder, but could not use the toilet in his cell because he did not have a catheter with him.[2] Harkless alleges that none of the Jail employees or medical staff checked on him during this time, and he therefore knocked on the cell window to get the attention of a passing Jail employee, but to no avail. Harkless alleges that he then began leaking urine on himself, and he "decided to try to get the jailers' attention again." Harkless alleges that, after he knocked again, several jailers entered his cell, grabbed his wheelchair, and pushed him down the hall to a cell without any windows. The jailers were followed by another jail employee who was recording the transfer with a video camera.

The jailers grabbed Harkless by his arms, lifted him from the wheelchair, and laid Harkless face down on the cell floor. The jailers then held Harkless down in a "submission hold" while they removed his clothes, and Harkless alleges that one of the

---

[1] Harkless alleges that the incident occurred on October 17, 2014, but this is the same day that his lawsuit was filed in this Court. It is more likely that the incident in question took place in October 2012, but that fact is ultimately not relevant to the analysis here.

[2] Although Harkless originally alleged that his catheter had been taken from him, his amended pleadings now only allege that he is unable to remember whether he had a catheter with him at the time of his arrest.

jailers placed their knees on his back to keep him on the ground. According to Harkless, jailers twisted his limbs and neck while pushing his torso onto the ground, causing him "considerable pain" and he cried out "repeatedly." When the jailers finally released their hold, Harkless informed them that his leg had been injured and requested a doctor. Harkless then alleges that he was denied medical attention for "several more hours," while he lay on the floor in the windowless cell, naked and in a pool of his own urine. Harkless remained in that same general condition overnight. The next day, a jailer returned his urine-soaked clothes and wheel chair, and Harkless was released to a family member. Harkless then went to the Matagorda Regional Medical Center, where x-rays confirmed that his right leg had been fractured.

Harkless filed this lawsuit in October 2014. (Dkt. 1). The County filed its first motion to dismiss on December 9, 2014. (Dkt. 5). In response, Harkless filed his First Amended Complaint. (Dkt. 12). The County then, again, moved to dismiss his claims. (Dkt. 13). Harkless again amended his complaint, filing his "Second Amended Complaint," on August 3, 2015.

In this most recent pleading, Harkless alleges that Brazoria County employees violated his civil rights under the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983, by restraining him with such excessive force that his leg was broken. Harkless alleges that the County failed to provide supervision and proper training to prevent instances of excessive force, and that the County is liable "based upon: (1) an express policy; (2) a widespread practice that may not be expressed but which is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) a decision

by someone, such as the Sheriff, with final decision making authority as to the issue at hand." Harkless specifically alleges that the County failed to adequately train its jailers and law enforcement officers to avoid the use of excessive force and to properly monitor and accommodate handicapped persons in custody or detention, and that the County's failures "[were] the result of deliberate indifference and/or conscious disregard for the constitutionally protected rights of others." Harkless alleges that similar excessive force incidents have occurred in the past—specifically naming one other lawsuit—but that the County did nothing to address the misconduct of its employees in his case or in the other case.

Harkless also alleges that the County violated Title II of the Americans with Disabilities Act ("the ADA"), 42 U.S.C. § 12131, by intentionally discriminating against him "due to his obvious physical handicap," by failing and refusing to provide him with a catheter to use the restroom, failing to train staff to adequately assess inmates' disabilities, failing to train staff to accommodate inmates' disabilities, and by failing and refusing to make accommodations so that he could use the restroom. Harkless further alleges that the County violated the ADA by failing and refusing to modify its facilities, services, accommodations, and programs to reasonably accommodate him and his physical disabilities. Harkless seeks to recover his reasonable and necessary mental expenses, as well as monetary damages for pain and suffering, and mental anguish.

The case is set for trial on June 14, 2016. Discovery ended on October 30, 2015.

## STANDARD OF REVIEW

Under Rule 8 of the Federal Rules of Civil Procedure, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A Rule 12(b)(6) motion tests the formal sufficiency of the pleadings and is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). The court must accept the factual allegations of the complaint as true, view them in a light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor. *Id*. To defeat a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Twombly*, 127 S.Ct. at 1965). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (quoting *Twombly*, 127 S.Ct. at 1965). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id*. (quoting *Twombly*, 127 S.Ct. at 1966). Moreover, the court does not accept as true legal conclusions: "Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 1950.

## APPLICABLE LAW

### A. Section 1983

42 U.S.C. § 1983 provides a private right of action for the deprivation of rights, privileges, and immunities secured by the Constitution or laws of the United States. A complaint under § 1983 must allege that the acts complained of occurred under color of state law and that the complaining parties were deprived of rights guaranteed by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981), overruled on other grounds, *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Piotrowski v. City of Houston*, 51 F.3d 512, 515 (5th Cir. 1995). A complaint under § 1983 must also allege that the constitutional or statutory deprivation was intentional or due to deliberate indifference and not the result of mere negligence. *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Plaintiffs suing public officials under § 1983 must file short and plain complaints that must be factual and not conclusive. *Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir. 1995) (en banc).

### B. Municipal Liability under § 1983

A municipality can be held liable under § 1983 only when the municipality itself causes a constitutional deprivation. *See City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989); *Monell v. Dept. of Soc. Servs*., 436 U.S. 658, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978). This requires the execution of an official

city policy or custom that results in the injury made the basis of the § 1983 claim. *Monell*, 98 S.Ct. at 2035–36. Proof of municipal liability sufficient to satisfy *Monell* requires: (1) an official policy or custom, of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose "moving force" is that policy or custom. *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002).

For purposes of municipal liability, an official policy may be (1) a policy statement, ordinance, or regulation, or (2) "a persistent, widespread practice of City officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001) (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc)); *see also Zarnow v. City of Wichita Falls*, 614 F.3d 161, 166 (5th Cir. 2010). "The description of a policy or custom and its relationship to the underlying constitutional violation, moreover, cannot be conclusory; it must contain specific facts." *Spiller v. City of Texas City*, 130 F.3d 162, 167 (5th Cir. 1997).

### C. The ADA

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Public entities include "[a]ny State or local government" and "[a]ny department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1). In

general, to state a prima facie claim for discrimination under the ADA, a plaintiff must show: (1) he is a qualified individual under the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is because of his disability. *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 671–72 (5th Cir. 2004), cert. denied sub nom, *Corrigan v. Washington*, 544 U.S. 1034, 125 S.Ct. 2273, 161 L.Ed.2d 1061 (2005). Under Title II of the ADA, "'discrimination need not be the sole reason'" for the exclusion or denial of benefits to the plaintiff. *Soledad v. United States Department of Treasury,* 304 F.3d 500, 503–04 (5th Cir. 2002).

In addition to bringing claims for denials of benefits or other forms of discrimination, disabled persons can also bring "reasonable accommodation" claims under the ADA. The regulations implementing the ADA require that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). If modifications are necessary to avoid discrimination, the ADA "impose[s] upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals. Where a defendant fails to meet this affirmative obligation, the cause of that failure is irrelevant." *Bennett–Nelson v. Louisiana Board of Regents*, 431 F.3d 448, 454–55 (5th Cir. 2005) (internal citation omitted), cert. denied sub nom, *Kelly v. Department of*

*Labor*, 547 U.S. 1098, 126 S.Ct. 1888, 164 L.Ed.2d 568 (2006). The accommodation must be sufficient to provide a disabled person "meaningful access to the benefit" or service offered by a public entity. *See Alexander v. Choate*, 469 U.S. 287, 301, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). If the court finds that an accommodation is required to prevent discrimination, the court must then determine whether the requested accommodation is "reasonable," or whether it would impose "undue financial or administrative burdens" or require a "fundamental alteration in the nature of the program." *Bennett-Nelson*, 431 F.3d at 455 n. 12 (quoting *School Board of Nassau County v. Arline*, 480 U.S. 273, 288 n. 17, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987)) (internal quotation marks omitted). In this regard, it is sufficient that the plaintiff "'suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits.'" *Henrietta D. v. Bloomberg*, 331 F.3d 261, 280 (2nd Cir. 2003) (quoting *Borkowski v. Valley Central School District*, 63 F.3d 131, 138 (2nd Cir. 1995)), cert. denied, 541 U.S. 936, 124 S.Ct. 1658, 158 L.Ed.2d 356 (2004). Once the plaintiff has done this, he "'has made out a prima facie showing that a reasonable accommodation is available.'" *Id.* (quoting *Borkowski*, 63 F.3d at 138).

## ANALYSIS

### A. Harkless fails to state a claim under § 1983.

The County contends that Harkless has failed to plead facts that would support a finding that the County is liable under the standards set out in *Monell v. Dep't. of Social Services.* The Court agrees.

1. **Municipal liability for violations of § 1983 requires more than** *respondeat superior* **allegations.**

"[M]unicipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (quoting *Monell v. Dep't. of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). "The three attribution principles identified here—a policymaker, an official policy, and the moving force of the policy—are necessary to distinguish individual violations perpetrated by local government employees from those that can be fairly identified as actions of the government itself." *Id.* (internal quotations omitted).

    a. **A policymaker.**

"[T]he unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability." *Piotrowski*, 237 F.3d at 578. Therefore, to sustain liability under § 1983, plaintiffs must point to more than the actions of municipal employees, they must also "identify a policymaker with final policymaking authority and a policy that is the 'moving force' behind the alleged constitutional violation." *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003). In determining whether the plaintiff has properly identified a policy maker, the "court would not be justified in assuming that municipal policymaking authority lies somewhere other

than where the applicable law purports to put it." *Id*. at 248 (citing *City of St. Louis v. Praprotnik,* 485 U.S. 112, 126, 108 S.Ct. 915, 925, 99 L.Ed.2d 107 (1988).

### b. A policy.

In this context, "[o]fficial municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61, 131 S. Ct. 1350, 1359, 179 L. Ed. 2d 417 (2011). In other words, a custom or policy can stem from a policy statement formally announced by an official policymaker, or it can be be demonstrated through a "'persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy.'" *Zarnow v. City of Wichita Falls, Tex*., 614 F.3d 161, 168-69 (5th Cir. 2010). ("A pattern of conduct is necessary only when the municipal actors are not policymakers"). Such a pattern of conduct requires "similarity and specificity; [p]rior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question . . . . A pattern also requires 'sufficiently numerous prior incidents,' as opposed to 'isolated instances.'" *Peterson v. City of Fort Worth, Texas*, 588 F.3d 838, 851 (5th Cir. 2009). "If actions of city employees are to be used to prove a custom for which the municipality is liable, those actions must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees." *Webster v. City of Houston*, 735 F.2d 838, 842 (5th Cir.

1984); *Peterson*, 588 F.3d at 850. In other words, "[i]t is not enough that an illegal custom exist; municipal policymakers, who are the persons capable of subjecting a municipality to liability, must be chargeable with awareness of the custom." *Milam v. City of San Antonio*, 113 Fed. App'x. 622, 626 n.3 (5th Cir. 2004); *see also Okon v. Harris County Hosp. Dist.,* 426 Fed. App'x 312, 316  (5th Cir. 2011) ("The governing body of the municipality or an official to whom that body has delegated policy-making authority must have actual or constructive knowledge of such a custom.").

### c.  A violation of constitutional rights whose "moving force" is the policy or custom.

Next, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). In this context, a municipality's policy of inaction despite awareness—constructive or actual—that its policy will cause a constitutional violation "'is the functional equivalent of a decision by the city itself to violate the Constitution.'" *Connick v. Thompson*, 563 U.S. 51, 131 S.Ct. 1350, 1360, 179 L.Ed.2d 417 (2011), citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 395, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Accordingly, the Supreme Court has found that "[i]n limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Id*. at 61 (but noting, "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a

failure to train."). In these cases, "[a] municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Id.* (citing *Canton*, 489 U.S., at 388, 109 S.Ct. 1197.). "Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program," because the Supreme Court has found that such a "'policy of inaction' . . . is the functional equivalent of a decision by the city itself to violate the Constitution." *Id.*

To demonstrate deliberate indifference in a failure-to-train lawsuit, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary.'" *Id.* (citing *Bryan Cty.*, 520 U.S., at 409, 117 S.Ct. 1382). The Supreme Court has, however, acknowledged that "'in a narrow range of circumstances,' a pattern of similar violations might not be necessary to show deliberate indifference." *Id.* (discussing hypothetical example of city arming police force with firearms and deploying armed officers to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force, theorizing that such decision not to train officers about constitutional limits on use of deadly force could reflect city's deliberate indifference to the "highly predictable consequence" that civil rights would be violated). However, "to establish a 'deliberate or conscious choice' or such 'deliberate indifference,' a plaintiff must present some evidence that the municipality knew or should have known of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take

any action." *Tennant v. Florida*, 111 F. Supp. 2d 1326, 1332 (S.D. Fla. 2000) (citing *Board of County Com'rs v. Brown*, 520 U.S. 397, 401–11, 117 S.Ct. 1382, 1390–91, 137 L.Ed.2d 626 (1997)); *see also Valle v. City of Houston*, 613 F.3d 536, 549 (5th Cir. 2010) (noting, "This court has been wary of finding municipal liability on the basis of a single incident to avoid running afoul of the Supreme Court's consistent rejection of *respondeat superior* liability."). "The single incident exception requires proof of the possibility of recurring situations that present an obvious potential for violation of constitutional rights and the need for additional or different police training." *Valle*, 613 F.3d at 549.

### 2. Courts often "balance" motions to dismiss in § 1983 claims.

Evaluating a § 1983 claim against a municipality under Rule 12(b)(6), some courts have found that "only minimal factual allegations should be required at the motion to dismiss stage," and "those allegations need not specifically state what the policy is, as the plaintiff will generally not have access to it, but may be more general." *Harvey v. Montgomery County*, Tex., No. 11-CV-1815, 2012 WL 12530, at *4 (S.D. Tex. Jan. 3, 2012); *Thomas v. City of Galveston, Texas*, 800 F. Supp. 2d 826, 843 (S.D. Tex. 2011). "Still, a plaintiff suing a municipality must provide fair notice to the defendant, and this requires more than generically restating the elements of municipal liability." *Thomas*, 800 F. Supp. 2d at 843. "Allegations that provide such notice could include, but are not limited to, past incidents of misconduct to others, multiple harms that occurred to the plaintiff himself, misconduct that occurred in the open, the involvement of multiple officials in the misconduct, or the specific topic of the challenged policy or training inadequacy." *Id*. (footnotes omitted). In the words of United States District Judge Ellison,

this is a "balance," in that the rules require more than boilerplate allegations, but they do not necessarily demand allegations of "specific facts that prove the existence of a policy." *Id*. at 843–44. ("Where a plaintiff provides more than a boilerplate recitation of the grounds for municipal liability, and instead makes some additional allegation to put the municipality on fair notice of the grounds for which it is being sued, 'federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later.'").

### 3. Harkless's allegations are not sufficient under *Monell*.

Reviewing Harkless's allegations relating to the County's violation of § 1983, the Court finds that his claims cannot survive scrutiny under Rule 12(b)(6) and the authorities discussed above. Even assuming that a constitutional violation occurred because the jailers used excessive force,[3] the law severely limits the circumstances under which the County may be found liable. This case has now been on file for quite some time—the trial date is looming and the discovery deadline has long passed—but Harkless's twice-amended pleadings still do not go beyond "boilerplate" allegations.

For example, Harkless has not specifically identified the policy maker or official who has final authority to establish policy on the questions at issue. Further, Harkless does not allege any other circumstances in which County employees have used excessive

---

[3] Although it not relevant to the disposition of this motion to dismiss, the Court notes that the County's motion for summary judgment was filed prior to the current motion. Accordingly, the Court reviewed the summary judgment evidence on file in this case, including a video of the "submission hold" used on Harkless, the marked appearance of Harkless's leg, and the apparent force with which the jailers leaned on or held Harkless down while twisting and pulling his limbs.

force against handicapped persons, or any other times where he himself has been the victim of excessive force by County employees. Nor does he specifically address the particular kind of training he believes the County should have provided for its employees regarding disabled or handicapped individuals. *Compare Callaway v. City of Austin,* A-15-CV-00103-SS, 2015 WL 4323174, at *10 (W.D. Tex. July 14, 2015) (plaintiff alleged excessive force due to policies as well as failure to train during involuntary DWI blood draw, and pointed out specific policies (drawing blood at jail, and using a restraint chair, a hood, and physical force up to and including choke holds in every case of an involuntary blood draw) and failures by Travis County (failure to provide procedures to follow during the blood draw that ensure that the blood draw will be safe and sanitary) as well as that other persons had been subject to the same constitutional violations during these blood draws, and that Travis County was aware of these violations.). Finally, Harkless does not make any allegations about the "possibility of recurring situations that present an obvious potential for violation of constitutional rights and the need for additional or different police training." *Valle*, 613 F.3d at 549. The single other case Harkless cites of excessive force by the County involved wholly different allegations, and it did not allege excessive force against a handicapped person or the use of a "submission hold" in remotely similar circumstances.

Accordingly, the Court finds that Harkless's claims under § 1983 must be dismissed, and that the claims should be dismissed with prejudice.

**B.  Harkless fails to state a claim under the ADA.**

The County also contends that Harkless's claims under the ADA should be dismissed because he has failed to state a claim upon which relief can be granted.  The Court again agrees.

Title II of the ADA protects "qualified individuals" from being denied the benefits of or participation in "the services, programs, or activities of a public entity," and it likewise forbids "discrimination" by such public entities on the basis of an individual's disability. 42 U.S.C. § 12132. Harkless alleges that the County knew that he was bound to a wheelchair and that he could not use his legs, and nonetheless intentionally discriminated against him and intentionally failed to accommodate him, by (1) failing and refusing to provide him with a catheter to use the restroom; (2) failing to train staff to adequately assess inmates' disabilities; (3) failing to train staff to accommodate inmates' disabilities; and (4) failing and refusing to make accommodations so that he could use the restroom.

The County contends that Harkless's pleading is deficient because, although Harkless's inability to use his legs might have been "obvious" to County officials, Harkless has not sufficiently alleged that the County employees knew or should have known that he needed a catheter to urinate. *See, e.g., Hall v. Thomas*, 190 F.3d 693, 696 (5th Cir. 1999) (stating, "[A]ny alleged discriminatory conduct could not have been 'because of' Hall's disability, since the relevant actors were not apprised of Hall's status as a disabled person."). The Court agrees. Harkless never alleges that he informed County

employees that he needed a catheter to use the restroom, nor does he allege that they should have been aware from surrounding circumstances that he would need a catheter—for example, he does not allege that he had a catheter in his possession at the time of his arrest, or that persons in wheelchairs often require catheters to urinate.

Similarly, Harkless does not specifically delineate the "benefit" he alleges that the County denied to him because of his disability, nor does he allege that the provision of a catheter is one of the "the services, programs, or activities of [the County]." *See, e.g., Van Velzor v. City of Burleson*, No. 3:12-CV-2508-G, 2013 WL 3579339, at *7 (N.D. Tex. July 12, 2013) ("While the ADA and the Rehabilitation Act are intended to provide disabled individuals equal and meaningful access to a public entity's existing services, these statutes do not go so far as to provide a cause of action for every instance in which an individual finds the services provided by a public entity to be dissatisfactory.").

Accordingly, the Court finds that Harkless has failed to state a claim upon which relief may be granted, and it further finds that his claim under the ADA should be dismissed, with prejudice.

## CONCLUSION

This case is a sobering example of the balance that must be struck between an individual's constitutional right to be free from excessive force and the principle that a municipal authority should not be held responsible for the acts of rogue employees. Despite the age of this case and ample opportunity to conduct discovery, Harkless's amended pleadings still have not yet stated a claim against the County upon which relief

may be granted. Accordingly, the Court finds that the County's motion to dismiss should be **GRANTED**, and that Harkless's claims should be **DISMISSED**, ***with prejudice***.

A final judgment shall be entered separately.

All other pending motions are hereby **DENIED** as **MOOT**.

SIGNED at Galveston, Texas on April 28, 2016.

_____
GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE